IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

UNITED STATES OF AMERICA, .   Case No.  7:21-CR-00187-DC
                             .
          Plaintiff,         .
                             .
     v.                      .
                             .
ASHLEY BENSON,               .
                             .
          Defendant.         .   Tuesday, February 8, 2022
. . . . . . . . . . . . . .      1:35 P.M.

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE DAVID C. COUNTS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:      United States Attorney's Office
                         BY: MONICA DANIELS, ESQ.
                         400 West Illinois Avenue, Suite 1200
                         Midland, Texas 79701

For the Defendant:       Robert Victor Garcia, Jr.,
                         Attorney At Law
                         BY:  ROBERT VICTOR GARCIA, ESQ.
                         413 North Texas Avenue
                         Odessa, Texas 79761

Deputy Clerk:            Cristina Lerma
                         United States District Court
                         200 East Wall Street, Room 222
                         Midland, Texas 79701


Transcription Company:   Liberty Transcripts
                         7306 Danwood Drive
                         Austin, Texas 78759
                         (847) 848-4907
                         www.libertytranscripts.com




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

INDEX

|                              | Page |
| ---------------------------- | ---- |
| Case called                  | 3    |
| Sentencing                   | 26   |
| End of Proceedings           | 28   |
| Certification of Transcriber | 28   |

WITNESSES:

FOR THE GOVERNMENT:

(None.)

FOR THE DEFENDANT:

(None.)

EXHIBITS:

FOR THE GOVERNMENT:

(None.)

FOR THE DEFENDANT:

(None.)

<u>     MIDLAND, TEXAS, TUESDAY, FEBRUARY 8, 2022, 1:35 P.M.</u>

1

2          THE COURT:  The Court calls U.S. v. Ashley Benson,

3 this is MO:21-CR-187, today for sentencing.

4          MS. DANIELS:  Monica Daniels for the United States.

5          MR. GARCIA:  Good afternoon, Your Honor.  Bob Garcia

6 on behalf of Ms. Benson.  We're present and ready.

7          THE COURT:  Thank you.

8          Ms. Benson, you may remove your face covering if

9 you'd like during this hearing so that we can make sure we

10 understand you and all.

11          And, Ms. Benson, you're Ashley Benson, right?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Mr. Garcia, do you believe your client to

14 be competent?

15          MR. GARCIA:  I do, Your Honor.

16          THE COURT:  Very good.  And have you reviewed with

17 her the presentence investigation report in this case?

18          MR. GARCIA:  I have.

19          THE COURT:  And, Ms. Benson, you've reviewed this

20 report, right?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  And I've got a number of things.  I've

23 got a -- Defense has filed a sealed sentencing memorandum.

24 I've got letters, I've got emails, all kinds of stuff.  So

25 we'll talk about all of that, I promise you.

1          Mr. Garcia, are there objections or corrections to

2   the report from the Defense?

3          MR. GARCIA:  Your Honor, we did file some objections.

4          THE COURT:  Yes, sir.

5          MR. GARCIA:  I think we filed maybe two or three, but

6   I'm going to limit it to the first objection that we filed as

7   far as the adjustment for minor role.

8          THE COURT:  Yes, sir.

9          MR. GARCIA:  And then I also would like to argue the

10  request for a variance.

11         THE COURT:  Okay.  So there was one for importation

12  and one for safety valve.  Are you --

13         MR. GARCIA:  Yes.  And I --

14         THE COURT:  Are you withdrawing?

15         MR. GARCIA:  I'm making the -- I made the objections,

16  and I don't necessarily disagree with the analysis.  I think

17  the law is what the law is.

18         THE COURT:  So those are withdrawn?

19         MR. GARCIA:  Yes, sir.

20         THE COURT:  All right.  As to minor role, go right

21  ahead.

22         MR. GARCIA:  Your Honor, as to the issue of minor

23  role, I think that's a very big issue in this case because what

24  you have here starting off or as it ended up was a what I would

25  characterize as a global drug trafficking organization.  So

we're talking about an organization that dealt in multiple kilo
quantities of not only methamphetamine but also other drugs,
firearms, you know, those kinds of things.

(Pause)

THE COURT:  I'm sorry.  My apologies.

MR. GARCIA:  That's okay, Your Honor.

THE COURT:  I'm listening to you.

MR. GARCIA:  We believe that, at the very least, she
would be entitled to a minor role in the case based on the
requirements of 3B1.2 that sets out pretty much what the minor
role would be.

Obviously, there's much -- there were several
participants in the case, and if the Court for reference would
look at Page 6 of our sentencing memorandum --

THE COURT:  Yes, sir.

MR. GARCIA:  -- it lists the other participants,
Dustin Harris, which was the -- basically the head of this
organization; so was Steven Westfall, his what he would
consider his right-hand man; and Timothy Tolbert who was  a
major distributor for Mr. Harris; and Mr. Kennedy was a
transporter, go pick up drugs for Mr. Harris.  There's another
gentleman by the name of Wooten that was arrested when Mr.
Tolbert was arrested.  They found seven ounces of
methamphetamine on him.  He received a sentence of 125 months.

These people were involved in the importation, in the

1 shipping and packaging of the drugs, the methamphetamine, to

2 places outside of the United States.  They were selling in New

3 Zealand.  They were selling in Indonesia.  And they were

4 dealing with -- they were getting their supplies from a

5 gentleman that was associated with the Sinoloa Cartel.  So

6 we're talking, as I said, I think we're talking global

7 connections in this case.

8        Ms. Benson, on the other hand, the way she became

9 part of this criminal activity was because of her using or

10 obtaining her source of supply from Mr. Tolbert.  I think as

11 the PSR indicates, over a period of time, she would buy like in

12 two-ounce quantities, and she did that for -- on several

13 occasions.  The total that was attributed to her was 1.12

14 kilograms of actual methamphetamine that put her in this

15 category.

16        And so compared to the other participants in this

17 case, I think -- and this is just sort of a rough estimate of

18 what the reports say, and I've attached the offense reports to

19 my sentencing memorandum.  And I'd ask, obviously, that my

20 objections, my sentencing memorandum be made a part of the

21 record.

22        But it shows Mr. Harris, Mr. Westfall being involved

23 with over -- at a very conservative level over 100 kilograms of

24 methamphetamine.  Mr. Tolbert just by his own statements

25 involved with over 45 kilos of methamphetamine.  Mr. Kennedy on

1  what he would admit was involved with at least nine kilos of

2  methamphetamine that he transported.  And, like I said, Ms.

3  Benson comparatively speaking, she's looking at 1.12 kilos over

4  a period of time.

5          And like I said, this also -- I think the reports

6  also indicate that Mr. Tolbert was telling the officers that

7  Mr. Harris was encouraging him to trade for firearms and do all

8  that.  So, you know, we've got a firearm trade also going on at

9  the same time.

10          The participation from Ms. Benson, if you go down the

11  factors that the guideline asks you to consider, you know,

12  whether she understood the scope and nature of this criminal

13  activity.  And I think if you look at the -- not only the PSR

14  but also the reports that we did attached to our sentencing

15  memorandum, Ms. Benson believed that Mr. Tolbert actually made

16  his own methamphetamine with a couple of guys in Downtown

17  Odessa.  That's how much she knew about what they were involved

18  in.

19          And then she was -- so she obviously did not have a

20  clue as to just how extensive and how the criminal activity was

21  structured.  Obviously, she's not -- she wasn't part of any

22  planning.  There's no indication at all from any of the

23  reports, any facts stated in the PSR that would indicate that

24  she was participating in any planning of the criminal activity

25  of the drug trafficking organization of Mr. Harris, any

1  decision-making authority, or that she influenced any

2  decisions, and that her participation was limited to having

3  Mr. Tolbert as her source of supply.

4         That was the extent of her financial interest.  I

5  mean she wasn't sharing the profits with him.  She wasn't doing

6  anything of that nature.

7         I think if the Court looks at what the guidelines ask

8  the Court to look at, it's very very plain that her role in the

9  entire criminal activity was very minor.  It was minor compared

10 to the average participant, the average participants being

11 Mr. Harris, Mr. Westfall, Mr. Tolbert, Mr. Kennedy.

12        And those are the -- compared to them, obviously, her

13 role in this case is substantially less than those participants

14 in the case.  That's not to say that there aren't any other

15 participants.  Obviously, the Jessie person that was Mr.

16 Harris' source, they were splitting the money, splitting the

17 proceeds of what they were doing, none of which involved Ms.

18 Benson.  And it was plain that she had no idea that they were

19 doing that.

20        I've agonized over this thing, Judge.  I spent -- I

21 actually pulled an all-nighter the other day just trying to get

22 it all straight in my mind.  But, you know, it's an important

23 case for Ms. Benson, for her family.  I don't think there's any

24 question that she's committed, you know, the crimes that she

25 pled guilty to.

1          But when she's put into that same activity as

2    everybody else, I think that she would be entitled to the

3    benefit or at least what the guidelines recommend in cases such

4    as hers.  I think it's a classic case of a minor role as

5    compared to the other participants in this criminal activity,

6    the entire criminal activity.

7          And so I would ask the Court to grant our objection

8    to the fact that there was no adjustment made for her minor

9    role in the case.

10          THE COURT:  Thank you.

11          Ms. Daniels?

12          MS. DANIELS:  Your Honor, Mr. Garcia referenced a

13    sentencing memorandum.  I haven't seen that.  He said that

14    there are cases or arrest reports attached to it.  I'd like to

15    see it, if I could, so I can make my argument.

16          THE COURT:  Do you have a copy?

17          MR. GARCIA:  I do.

18          THE COURT:  Ms. Daniels, do you want to take a few

19    minutes and look through it?

20          MS. DANIELS:  If I could, Your Honor.

21          THE COURT:  Yes.  So everybody have a seat.

22          Ms. Benson, go ahead and have a seat.  We'll let her

23    read that.

24      (Pause)

25          MR. GARCIA:  Did you want to do the other two?

1 They're probably short.

2          MS. DANIELS:  No, I don't need that long.

3          THE COURT:  The other two objections?

4          MR. GARCIA:  No, the other two Defendants --

5          THE COURT:  Oh, oh, oh, oh.

6          MR. GARCIA:  -- we're going to sentence.

7          THE COURT:  No, she's -- I've seen her before.  She's

8 a fast reader.  See, look how fast she's reading.  Are you

9 really reading that now?

10          MS. DANIELS:  Well, I really wanted to --

11          THE COURT:  Your concern is those reports, isn't it?

12          MS. DANIELS:  That and, also, the reference to how

13 much the other Defendants were attributed to them.  I just

14 wanted to look at that in making my argument, Your Honor.

15          But if I may, as a whole, I would say that the

16 Government agrees with the response from Probation, Your Honor.

17 We do not think that Ms. Benson had a minor role in this

18 incident.  We would point out the fact that she was providing

19 methamphetamine to Defendant Number 7, Mr. Cuellar, yes, thank

20 you.  She was purchasing ounces at a time from --

21          THE COURT:  Tolbert.

22          MS. DANIELS:  -- Timothy Tolbert.

23          THE COURT:  Okay.

24          MS. DANIELS:  Yes, Your Honor.  And she was providing

25 that to Mr. Cuellar for him to sell for her.  She was also

1   trading guns with Mr. Tolbert, as well.  As far as that safety

2   valve goes, Your Honor, that argument we would also argue that

3   that should not apply to her.  But --

4            THE COURT:  And he's withdrawn the safety valve --

5            MS. DANIELS:  Okay.

6            THE COURT:  -- objection.

7            MS. DANIELS:  Just for the record, I did want to

8   state that for the record, Judge.

9            THE COURT:  Yes.

10           MS. DANIELS:  But looking at the totality of the

11  circumstances here, yes, this case was very large.  It started,

12  and I was -- I had this case from the inception to all the way

13  through, Judge, so I was there.  I got the phone call, and it

14  started with Ms. Benson and Mr. Cuellar.  That's how it started

15  and then it just continued to grow from there.

16           But even from just looking at her portion, if you

17  just look at Ms. Benson and Mr. Cuellar and Mr. Tolbert, if you

18  just look at that, her participation there is not even a minor

19  role because she was purchasing large amounts of

20  methamphetamine from Mr. Tolbert over a period of time.  And

21  then she was providing the methamphetamine for someone else to

22  sell for her.

23           And we're not talking about a couple of ounces.  As

24  noted in the PSR, Your Honor, she's attributable for over a

25  thousand grams of methamphetamine, Your Honor.  And, also, I

1  would point to the case law that's cited by Probation, United

2  States v. Pike, and in that, it says that, you know, in that

3  case, the court did not err in denying the defendant an

4  adjustment for minor role because of his -- the fact that he

5  wasn't planning the whole conspiracy, he wasn't putting his

6  money together with everyone else, that doesn't make him any

7  less culpable than anyone else in the conspiracy.

8          So that's the Government's main argument in this

9  case.  Like, yes, it did turn out to be a very big case, but

10 Ms. Benson is no less culpable than anyone else in this

11 conspiracy.  And that's the Government's --

12          THE COURT:  Thank you.

13          MS. DANIELS:  -- argument, Your Honor.

14          THE COURT:  Thank you.

15          Mr. Garcia, anything else on that point?

16          MR. GARCIA:  Your Honor, just a couple of points that

17 Ms. Daniels brought up.  I think this trading of guns has to do

18 with when they asked her where did she get the gun.  She said

19 she traded her other gun to Mr. Tolbert for that particular gun

20 which is the gun that she's being prosecuted for in Count 5.

21 There's no -- while the organization itself was dealing in

22 apparently a firearm trade also, she has no role in that at

23 all.

24          And the other point that I wanted to make was also

25 that when Ms. Daniels argues that her role was average compared

1  to Mr. Harris and to Mr. Westfall and to Mr. Tolbert, just by

2  looking at their knowledge the way that they've debriefed, the

3  knowledge, the extent of their knowledge, the extent of how

4  they knew what the organization was doing, whether they were

5  doing it, with whom they were doing it, all the details, none

6  of which was ever supplied by Ms. Benson.

7        Ms. Benson was caught with two ounces, about two

8  ounces of methamphetamine and then during the debriefing, they

9  talked about how many times she had bought from her source,

10  which happened to be Tim Tolbert.  And that's where she comes

11  up with 1.1 kilos of the meth over the total period of time

12  that she dealt with him two ounces at a time.

13        Compared to the pounds and the kilos that Mr. Tolbert

14  was getting from Mr. Harris and the pounds and the kilos that

15  Mr. Harris -- well, and then the amount that was found in their

16  possession when they were arrested, that was incredibly large.

17  And the same thing with Mr. Harris and Mr. Westfall.  The

18  amounts that they were working with and what they were doing in

19  that organization pales in comparison to what Ms. Benson was

20  doing.  That's exactly what we're talking about as far as a

21  minor role.

22        We're talking somebody that's not like everybody else

23  in the whole thing.  It isn't just because you're a part of it

24  doesn't make you equal to everybody else.  I don't think she

25  could have told them, well, you can ship to New Zealand, you

1  got to ship to England.  I mean they're just -- you know, it

2  just doesn't work like that.  It didn't work like that in this

3  case either.

4          THE COURT:  Okay.  The Court in taking into

5  consideration all the arguments, the response by the U.S.

6  Probation officer, in reading obviously the Guidelines and the

7  case notes there, the comments, I find Ms. Benson to be no less

8  culpable than the average participant.  In fact, that's what I

9  exactly find her to be is average.

10          This is a huge case, obviously.  And by the way, her

11  1.12 kilograms is not small.  It's not a small amount.  I

12  realize in comparison to, you know, top dog, I think Mr.

13  Harris, I can see that.  But I do find her to be no less,

14  certainly not substantially less, but I don't find her to be

15  any less culpable than the average participant.

16          I'll overrule the objection.  Are there any other

17  objections or -- and you've withdrawn the importation and the

18  safety valve.  Are there any other objections or any

19  corrections?

20          MR. GARCIA:  No, Your Honor.

21          THE COURT:  All right.  Now let me ask Ms. -- since

22  there are reports, offense reports supplied as attachments, do

23  we want to seal this memorandum?

24          MR. GARCIA:  I think we did --

25          THE COURT:  It's already sealed?

1          MR. GARCIA:  -- yes --

2          THE COURT:  Okay.  Good, good, good.

3          MR. GARCIA:  -- seal them.

4          MS. DANIELS:  I would ask to, Your Honor.

5          THE COURT:  I just didn't see it.  Oh, it is sealed.

6 Yeah, it is.  I just didn't see it up there.

7          Any objections or corrections from the Government?

8          MS. DANIELS:  No, Your Honor.

9          THE COURT:  So the Court has reviewed the presentence

10 investigation report prepared by Senior U.S. Probation Officer

11 Douglas Bramley.  I find that report to be accurate.  I adopt

12 it and the application of the United States Sentencing

13 Guidelines contained in the report.

14          I find the Total Base Offense Level to be 33; the

15 Criminal History Category is III; the guideline range for

16 custody for Count 1 is 168 to 210 months; for Count 5, 5 years

17 to run by statute consecutively to any term of imprisonment

18 assessed in Count 1; supervised release Count 1 is five years,

19 Count 2 two to five years; ineligible for probation; $40,000 to

20 $10 million fine; a $100 mandatory special assessment pursuant

21 to the Victims of Crime Act in each count, totaling $200.

22          I received a letter from your dad -- is Mr. Thompson

23 your dad?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Curtis Thompson.  I think he's your dad

1 and --

2          MR. GARCIA:  And he's present, Your Honor.

3          THE COURT:  Oh, he's here?  Oh, thank you for being

4 here, sir.

5          MR. THOMPSON:  Yes, sir.  Thank you.

6          THE COURT:  Let's see.  Then we've got Peter Woods

7 who worked with you, I guess, over in Nursing, he says?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  At Buena Vida, is that how you say that?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  And then I got a letter from you.  Thank

12 you.  I got also from Jennifer Brown, that's your mom, right?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  That's what I thought.  And then that was

15 a long letter.  And good for her.  It was nice, though, and I

16 don't -- my heart aches for her, but it was long.

17         And then I think that was it.  Anyway, yeah.

18         So, Mr. Garcia, thank you for getting all these to

19 me.  I appreciate that.  I know you've got a sentencing

20 memorandum and a motion for a downward variance.  Go right

21 ahead.

22         MR. GARCIA:  Thank you, Your Honor.

23         You know, the question is is the sentence that the

24 Guidelines recommends in this case, is it sufficient more than

25 necessary to accomplish the goals of 3553(a)(2).  Your Honor,

because there's no way for the Court to go below the mandatory
minimums in both cases, I'm asking the Court to assess a
sentence at the minimum which is 120 months on Count 1 and,
obviously, the Count 5 is 60 months.  All together, we're
talking about 180 months.

      And otherwise, the guidelines call for a sentence of
almost 19 years, almost 20 years when all is said and done.  I
would ask the Court for a sentence at the minimum guideline
sentence in light of the fact that she is -- the role that she
played in this case was very substantial in terms of bringing
down a very, very big organization.  Were it not for her and
her willing to cooperate, willingness to cooperate, this
organization would not even have been discovered much less
prosecuted by the Government without her cooperation.

      As I point out in the memorandum, after she gets
arrested, they don't arrest her at that time pending her
cooperation.  They call her about two or three weeks later to
ask her to participate in a controlled buy on Mr. Tolbert,
which she does and she goes in there.  I mean she's never done
stuff like that before, but she follows the instructions that
the law enforcement officers do give her.  They give her I
think a lobe (phonetic) to be able to record not only audio
recordings but I think also video recordings of the
transaction.

      That gave them the basis to apply for a search

1 warrant, which they did where they found him with numerous

2 weapons, numerous large quantities of methamphetamine.  And

3 then from there on, he told them about Harris and the way the

4 whole operation worked.  They got a search warrant for Harris'

5 house, and that's how everything just fell apart.

6        It all began with Ms. Benson, with her trying to do,

7 you know, granted, she's trying to help herself.  There's no

8 question about it, but that's what people do in those

9 situations.  She's gotten the absolute option not to talk, not

10 to say anything, not to cooperate, not to do anything

11 whatsoever.  But she's -- she is trying to make amends for what

12 she's involved in.

13        You know, it amazes me how clients don't realize, you

14 know, the punishments that are involved when they're dealing

15 with actual methamphetamine.  To see the look on their faces

16 when they're -- they can't believe that they're exposed to that

17 much just based on the amounts that they have.  It just baffles

18 me to see that.

19        But, you know, and I think that's what motivates me

20 in terms of Ms. Benson and to try and get you to see that she

21 deserves some kind of recognition in her sentence for the

22 actions that she took in trying to remedy this thing.  I mean

23 she -- I think if the Court looks at the complaint that was

24 originally filed, and I'd ask the Court to take judicial notice

25 of the Court's file, but the original complaint that was filed

1  in this case didn't even include her.  And she -- who knows how
2  the decision was made.

3       I know that she was surprised when she was arrested
4  because she thought she had -- you know, that they agreed that
5  if she cooperated, she was going to -- you know, it wasn't
6  going to be as bad as everybody else was.  She ends up being in
7  the same boat as everybody else.  And by the same boat, I mean
8  her sentence right now is 168 months.  I think that puts her
9  right up there with everybody else, obviously, not as much as
10 Mr. Harris.

11      But if you combine that and the one gun that she had
12 with the several firearms that were found on everybody else's
13 possession, you know, it's just -- her sentence doesn't reflect
14 the seriousness compared to all the other Defendants.  And the
15 other Defendants wouldn't be before the Court and wouldn't be
16 sentenced or prosecuted by the Government, sentenced by this
17 Court to the times that I list out on Page 8 of my memorandum
18 without the original cooperation by Ms. Benson.

19      I think under the factors that are included, the
20 seriousness of the offense, if we look at her part in the
21 entire offense, it's certainly not -- there's no comparison.
22 And I think I put this in my sentencing memorandum.  What
23 concerns me on the other issues is I think with respect to Ms.
24 Benson, there's not going to be any deterrence problems at all.
25 I would bet my life that she would never be involved in

1   something like this.

2          I don't think there's -- the public needs any further

3   protection from her because remember no matter what this Court

4   decides, it can't decide to give her less than 120 months which

5   is a lot of time.  That's still a lot of time when you add the

6   gun charge.

7          What's going to happen when you have other -- I mean

8   just like we expect defendants to know what the law is and what

9   punishments they're facing and you shouldn't be surprised,

10  well, what if they become aware of what reward or what can they

11  expect to get by cooperating with the law enforcement.  I think

12  cooperation is a very very important aspect of law enforcement.

13  It's probably, you know, just as important as the forensics and

14  anything else because without the cooperation of other

15  defendants that have the inside knowledge, you're just not

16  going to get involved and discover and prosecute people like

17  the Harris drug organization.

18         So I think those things go into not only is it going

19  to deter Ms. -- any criminal conduct from Ms. Benson but is it

20  going to deter the criminal conduct from others, also.  To

21  protect the public would also -- like I said, the sentence

22  itself is going to put her away for 15 years and that's going

23  to protect the public for at least that long.  And it's not

24  anything to -- you know, to say that it's not enough time.

25         So, Your Honor, I understand the Court's I guess

1  historical position with regard to variances.  But there's got

2  to be a case somewhere that comes before this Court where a

3  variance is a very just disposition in a case.  I think this is

4  -- as many as I've had before you, I think this is the one.

5  And I would ask the Court to grant the variance that we're

6  requesting to 120 months on Count 1.

7          THE COURT:  Thank you.

8          Ms. Benson, what would you like to say?

9          THE DEFENDANT:  I would like to say I'm sorry, Your

10  Honor, and I take full responsibility for all my actions.  And

11  if you could please give me a second chance, I know that I will

12  never be in your courtroom again.  And my grandmother, she's my

13  other too, and she's going on 70 and if I get 15 years, I'm

14  scared that I will never see her again.  And if you can just

15  give me a second chance to be there with her, you know.

16          THE COURT:  And that's your grandmother here with

17  your dad --

18          THE DEFENDANT:  Yes.

19          THE COURT:  -- with your dad?

20          THE DEFENDANT:  Yes.  I don't want to lose her, and

21  she's my mom.  She has my kids, too.

22          THE COURT:  Sure.

23          THE DEFENDANT:  She means a lot to me, and I'm not

24  really who they say I am in that conspiracy.  That guy,

25  Cuellar, he was just my friend, you know.  Like I didn't go buy

1 a bunch -- I've never even seen more than a pound of meth.

2 I've never seen that much in my whole life, you know.  It was

3 just he said/she said, you know.  And I'm not a big drug

4 dealer, and I'm nothing like that.

5        And I'm not who they try to say I am.  And for me to

6 get 15 years, like I don't even think I can make it in there

7 for 15 years.

8        THE COURT:  Well, that's the minimum of what you can

9 get.  I mean that's -- you don't think you can make it for the

10 minimum?

11        THE DEFENDANT:  I mean I guess I would have to, but I

12 just don't -- I don't know.  I don't know, Your Honor.  If you

13 could just please -- I don't know what else to say, Your Honor.

14        THE COURT:  Okay.

15        Ms. Daniels?

16        MS. DANIELS:  Your Honor, as far as the sentencing

17 factors go, I just want to note a couple of things as far as

18 the methamphetamine being a very dangerous drug, as the Court

19 already knows that.  But I would also like to point out in

20 Paragraph 10, I think it's -- yes, in Paragraph 10 and it goes

21 -- carries on Page Number 7, Your Honor, it's noted that

22 Ms. Benson and Mr. Cuellar, they were living together, Your

23 Honor, at Ms. Benson's residence.

24        And it's noted in there that juveniles would come

25 over to the house and steal methamphetamine from the residence.

1 And that's where that whole kidnapping thing came from.  That's

2 separate and apart from this.  But I would like to just note

3 for the Court that that goes to the dangerousness of the

4 methamphetamine, that young juvenile kids -- and it's on video,

5 Your Honor, where the police go and they talk to the kids as

6 far as the kidnapping goes.  That was separate and apart from

7 Ms. Benson.

8       But the only reason I mention that is because I saw

9 the kids on video, and they were young kids, probably like 15

10 or 16 years old, Your Honor, who were getting -- who were

11 stealing methamphetamine because it was readily available at

12 Ms. -- from Ms. Benson's residence.  And that just goes to show

13 just one portion of how it's dangerous and how young kids are

14 getting it.  But I just wanted to note that.

15       Another thing I wanted to note for the record, I know

16 Mr. Garcia did a lot of talking about how Ms. Benson, you know,

17 cooperated with the Government and how she did things to help

18 the case, helped to progress the case.  And I just wanted the

19 Court to know that I did offer Ms. Benson a downward departure

20 of one level but she would have to withdraw her objections and

21 she decided not to do that.

22       So I just wanted the Court to know that because it

23 was a lot said as if there was no consideration taken in that.

24 And I just wanted the Court to know that I did consider that.

25       THE COURT:  Thank you.

1          MR. GARCIA:  And, Your Honor, in all fairness, I did
2  get that offer.  I got it yesterday, late yesterday afternoon.
3  And -- but when I wrote the memorandum, we had communicated for
4  a long time about that and never got any satisfactory response.
5          THE COURT:  Okay.
6          Ms. Benson, anything else you want to say?  I don't
7  want to cut you off if you got more.  I mean I know you're
8  upset.  I want you to get your composure because I don't want
9  you to regret not saying something.  You thank God you got a
10 long time to sit there and think, oh, I wish I had said this or
11 I wish I had said that.
12         THE DEFENDANT:  Yes, Your Honor.
13         THE COURT:  You don't have to make stuff up.  I just
14 --
15         THE DEFENDANT:  Yes, Your Honor.
16         THE COURT:  I don't want to --
17         THE DEFENDANT:  I have a letter.  Let me pull it out.
18 Thank you.
19         Okay.  It says, Judge Counts, I'm hoping that I have
20 the opportunity to tell you about myself and to let you know
21 that I'm not a bad person even though I'm standing in front of
22 you right now.  When I was growing up, I always had a passion
23 for helping animals and people.  I grew up wanting to be a
24 veterinarian.  And when I got older, I got a job at a nursing
25 home just as a housekeeper.

1        I worked there for about a year and I watched and
2   learned -- I watched and learned and fell in love with the
3   older residents.  That is when I decided to go to school and
4   become a CNA.  I got my certificate as a certified nursing
5   assistant, and I never thought about working in any other
6   field.

7        Unfortunately, I became friends with a coworker who
8   used drugs and then I was going through some things.  One day
9   she offered me some meth, and it went downhill from there for
10  almost a year.  And COVID hit and it made it easier than ever
11  to continue my journey with crystal meth.  On May 6, 2021, the
12  sheriffs called to my house and to make a long story short, I
13  got caught with meth and a gun.

14       It was then that I realized I could get a 15-year or
15  more sentence for my actions.  I immediately made a promise to
16  myself and my kids that I will not touch drugs again.  I got
17  clean and sober and I started changing my life.  I started
18  working again double shifts to stay busy.  I enrolled in
19  nursing school again, and I was supposed to start in July.

20       (Indiscernible) Gerald Ornelas (phonetic), the
21  officer that arrested me, who was the -- and I turned in my
22  supplier to him thinking maybe I earned a second chance.  I
23  worked at my job and I took care of my kids and stayed totally
24  away from drugs.  I was on my way to work and I got pulled over
25  with a warrant for conspiracy.

1          My heart dropped.  I never saw myself in front of you

2  right now.  I wrote you this to read to you today to tell you

3  if you gave me a second chance, I will not fail you for my kids

4  and for myself.  Thank you, Judge Counts.

5          THE COURT:  Thank you.

6          The Court in considering all the information that

7  I've received will deny the motion for downward variance.  The

8  Court does not depart from the recommended sentence pursuant to

9  the Sentencing Reform Act of 1984, which I have considered in

10  an advisory capacity, and the sentencing factors set forth in

11  18 United States Code Section 3553(a), which I have considered

12  in arriving at a reasonable sentence.

13          I find the guideline range in this case to be fair

14  and reasonable.  In consideration of your cooperative efforts,

15  though, the Defendant is placed in the custody of the United

16  States Bureau of Prisons to serve  term of imprisonment in

17  Count 1 for the bottom of the guideline range of 168 months and

18  in Count 5 to 60 months or 5 years to run by law by statute

19  consecutively to the term of imprisonment assessed in Count 1,

20  which is the 168.

21          And the Court does note that Ms. Benson is a Criminal

22  History Category III.  And typically, this Court would not

23  impose a sentence at the bottom of the guideline range.  I do

24  believe -- that's why I'm sentencing you at the bottom of the

25  guideline range because in consideration of the efforts that

1  you've made not only with the law enforcement at the time but

2  also later in some information I've received from the U.S.

3  Marshals.

4       Upon your release from the United States Bureau of

5  Prisons, you're placed on supervised release in each count for

6  five years, those terms to run concurrently.  So your five

7  years in prison for the firearm will run consecutively to the

8  168 months, but the term for your supervised release will be

9  five years in each count, to run together, to run concurrently.

10      The standard and mandatory conditions of supervision

11 are imposed.  Additionally, the Defendant shall submit to the

12 search condition of supervision within the Western District of

13 Texas.  There is no fine imposed, the Court finding the

14 Defendant has an inability to pay a fine.  There is a $100

15 mandatory special assessment you're required to pay in each

16 count, totaling $200.

17      Your presentence report will be sealed.  You have the

18 right to appeal your conviction and sentence, assuming you have

19 not given up that right.  You must file a notice of appeal in

20 writing within 14 days of the entry of this judgment if you

21 wish to do so.  And if you're unable to afford the appellate

22 costs, those services will be provided at no expense to you.

23      Mr. Garcia, anything further on behalf of Ms. Benson?

24      MR. GARCIA:  No, Your Honor.  And just for the

25 record, we object to the substantive and procedural

28

1  reasonableness of the sentence.

2           THE COURT:  Very good.

3           Ms. Daniels, anything further?

4           MS. DANIELS:  Nothing further, Your Honor.

5           THE COURT:  Ms. Benson, I thank your dad and your

6  grandmom for being here.  And I remand you to the custody of

7  the United States Marshal to serve your sentences.  I wish you

8  the very best.  Good luck to you and your family.

9       (Proceedings concluded at 2:16 p.m.)

10                        *  *  *  *  *

11

12

13                   **C E R T I F I C A T I O N**

14           I, Dipti Patel, court-approved transcriber, hereby

15  certify that the foregoing is a correct transcript from the

16  official electronic sound recording of the proceedings in the

17  above-entitled matter.

18

19

20  _____

21  DIPTI PATEL, AAERT NO. 997          DATE:  March 7, 2022

22  LIBERTY TRANSCRIPTS

23

24

25